**United States District Court**
For the Northern District of California

1
2
3
4
5
6               IN THE UNITED STATES DISTRICT COURT
7
8               FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10   NATIONAL UNION FIRE INSURANCE            No. C 05-02803 WHA
     COMPANY OF PITTSBURGH, PA, a
11   Pennsylvania corporation,
12        Plaintiff,                         **ORDER GRANTING**
                                             **PLAINTIFF'S MOTION FOR**
13     v.                                    **SUMMARY JUDGMENT**
                                             **REGARDING DEFENDANT'S**
14   LANDMARK AMERICAN INSURANCE             **DUTY TO DEFEND**
     COMPANY, an Oklahoma corporation, and
15   DOES 1 through 10,
16        Defendants.
17   _____/
18                         **INTRODUCTION**
19        In this dispute between insurers, plaintiff National Union Fire Insurance Company of
20   Pittsburgh, Pennsylvania moves for summary judgment on the issue of defendant Landmark
21   American Insurance Company's duty to defend.  This order finds that plaintiff has satisfied its
22   burden to impose a duty to defend on defendant.  Accordingly, plaintiff's motion is **GRANTED**.
23                          **STATEMENT**
24        On June 30, 2003, Matamoros Pipeline, Inc., a pipeline-welding company, entered into
25   an agreement with Mountain Cascade, Inc., a general contractor.  Pursuant to this agreement,
26   Matamoros was to provide subcontracting work on upcoming projects for Mountain Cascade.
27   The agreement was modified on September 21, 2004, and November 21, 2004 (Williamson
28   Decl. ¶ 2).

**United States District Court**
For the Northern District of California

Section VI of the agreement provided indemnification for Mountain Cascade by Matamoros (*id*. at Exh. A) (emphasis added):

> To the greatest extent permitted by law, SUBCONTRACTOR *shall defend*, indemnify and hold harmless CONTRACTOR . . . from and against all actions, penalties, assessments, fines actions by governmental authorities, demands, liabilities, claims, damages, costs, losses, and expenses, including but not limited to attorney's fees and costs, *which arise out of or are in any way related* (i) to this AGREEMENT, (ii) to actual or alleged actions or omissions by SUBCONTRACTOR or any of its subcontractors, suppliers, vendors, employees, or persons for whom it is responsible, or (iii) to the project(s) to which the AGREEMENT relates . . . of any kind whatsoever.

Section VII imposed certain insurance requirements on Matamoros (*ibid*.):

> SUBCONTRACTOR shall carry primary Commercial General Liability Insurance covering all operations by or on behalf of SUBCONTRACTOR, and actions or omissions by SUBCONTRACTOR, providing insurance for bodily injury and property damage liability.

Section VII further provided (*ibid.*):

> CONTRACTOR, its officers, directors, and employees, and OWNER shall be named as additional insureds under the Commercial General Liability policy and Excess Liability policy and such insurance afforded the additional insureds shall apply as primary insurance. Coverage for CONTRACTOR or OWNER shall not be called upon to contribute with this insurance.

Defendant Landmark issued a general-liability policy to Matamoros. Pursuant to the above agreement, Matamoros' policy with Landmark included Mountain Cascade as an additional insured. The Landmark policy provided (Ruettgers Decl. Exh C) (emphasis in original):

> **WHO IS AN INSURED** is amended to include as an insured the person or organization shown in the SCHEDULE, but only with respect to liability arising out of 'your work' for that insured by or for you.

> If you are required by a written contract to provide primary insurance, this policy shall be primary as respects your negligence.

In 2004, Mountain was retained by the East Bay Municipal Utilities District to construct a water-supply line in Walnut Creek, California. The project called for Mountain Cascade to dig a trench on the side of a roadway and install a 5' diameter water pipe. Matamoros' workers

2

United States District Court

For the Northern District of California

1  were to follow behind the Mountain Cascade crew and weld the pipe sections as they were laid

2  down.  The water line was being laid down parallel to a high-pressure-petroleum-fuel pipeline

3  owned by Kinder Morgan Energy Partners, L.P.  That pipeline was demarcated by warning

4  signs, but apparently inadequately so (Ruettgers Decl. Exh. A).

5          On November 9, 2004, the petroleum-fuel pipeline was punctured, apparently by an

6  excavator operated by Mountain Cascade (Johnson Decl. Exh. A).  It is undisputed that because

7  of the puncture, pressurized petroleum was released into the trench.  The parties, however,

8  dispute what happened next.  Somehow, the pressurized petroleum ignited leading to an

9  explosion and fire.  Five workers, three from Matamoros and two from Mountain Cascade, were

10  killed by the explosion.  Four others were badly injured.  There was also extensive property

11  damage.

12          According to an accident-investigation report prepared by the California Department of

13  Industrial Relations' Division of Occupational Safety and Health ("CalOSHA"), the petroleum

14  "was ignited by the welding activities of Matamoros"  (Johnson Decl. Exh. A).[1]  CalOSHA's

15  report included as a factual finding that "the gasoline released due to the puncture of the

16  excavator tooth was ignited by the welding activities performed by the employees of

17  Matamoros" (*ibid.*).  Likewise, according to a report prepared by the Department of Forestry

18  and Fire Protection, Office of the State Fire Marshal, "[s]everal seconds after the line was hit,

19  the gasoline streaming out of the line was ignited by welders employed by Matamoros

20  Pipelines, Inc. who were also working on the new water supply pipeline" (Ruettgers Exh. A).

21  Defendant, however, questions the conclusion of CalOSHA and the Fire Marshal that the

22  welding equipment ignited the leaking petroleum.  Defendant contends that the neither

23  CalOSHA's conclusion nor the Fire Marshal's conclusion were based on factual evidence.

24          Mike Matamoros, president of Matamoros, did his own inspection of the pipeline after

25  the accident (he was not present at the time of the accident).  According to Mr. Matamoros, his

26  workers were using "semi-automatic welding machines" (Matamoros Decl. ¶ 3).  Unlike

27

28          [1] Defendant objects to the CalOSHA report as improper-hearsay evidence.  This order finds that the
report is properly admissible under the exception to the hearsay rule for public records and reports provided for
by Federal Rule of Evidence 803(8).

3

United States District Court

For the Northern District of California

1   "traditional welding machines," a semi-automatic machine "allows the worker to use a welding

2   rod only when the trigger is depressed" (*ibid.*).  "When the trigger is released, the machines'

3   circuit is shut-off and there is no spark or "arc" coming from the welding rod" (*ibid.*).

4   According to defendant, therefore, during the seconds following alert of the leak, Matamoros'

5   workers would have dropped their welding machines.  The machines would have been shut off

6   and thus unable to sends sparks causing the explosion.  Likewise, according to defense expert

7   on fire origin and cause investigation, William E. Gale. Jr., there were numerous "potential

8   ignition sources" other than the welding machines (Gale Decl. ¶ 5).  These sources include

9   "vehicles in the area and Mountain Cascade's excavator, and at least one truck that Oscar

10  Navarro [a Mountain Cascade employee] left at the scene after the gas pipeline was punctured"

11  (*id*. at ¶ 4).

12       Shortly after the explosion, nine complaints and one cross-complaint were filed in the

13  Superior Court of California for the County of Contra Costa seeking to recover for the injuries

14  and damages relating to the Walnut Creek explosion.[2]  Mountain Cascade was named as a

15  defendant in all ten actions; Matamoros was named as a defendant in two of the actions.

16       Mountain Cascade's own insurance company was National Union Fire Insurance

17  Company of Pittsburgh, Pennsylvania.  On behalf of Mountain Cascade, National Union

18  tendered Mountain Cascade's defense for all of the actions against it.  Landmark, which also

19  insured Mountain Cascade via the contract above, refused National Union's request to defend

20  Mountain Cascade, determining that Mountain Cascade was not covered under Matamoros'

21  policy with Landmark.  National Union has thus incurred over $600,000 in the defense of

22  Mountain Cascade.

23       On July 8, 2005, National Union brought this action against Landmark, seeking

24  declaratory relief, equitable indemnity and equitable contribution.  Plaintiff now moves for

25  summary judgment on the issue of whether defendant had and continues to have a duty to

26

27  ────────────

28       [2]Plaintiff requests that judicial notice be taken of these underlying complaints  (RJN Exhs. 1–10).  Such
public records are proper subjects for judicial notice under Federal Rule of Evidence 201.  This order does not,
however, judicially notice these complaints for the truth of the allegations contained therein.

4

United States District Court

For the Northern District of California

1  defend Mountain Cascade in the underlying actions for damages relating to the Walnut Creek

2  explosion.[3]

3                                    **ANALYSIS**

4          Summary judgment is proper where the pleadings, discovery and affidavits show "that

5  there is no genuine issue as to any material fact and that the moving party is entitled to

6  judgment as a matter of law." FRCP 56(c). The moving party has the initial burden of

7  production to demonstrate the absence of any genuine issue of material fact. *Playboy*

8  *Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1023–24 (9th Cir. 2004).

9  Once the moving party meets its initial burden, the nonmoving party must "designate specific

10 facts showing there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24

11 (1986).

12         **1.    DUTY TO DEFEND.**

13         The duty to defend here is governed by California law. "Insurance policies are

14 construed according to the same principles that govern interpretation of other contracts." *Vitton*

15 *Constr. Co. v. Pacific Ins. Co.*, 110 Cal. App. 4th 762, 766 (2003). Plaintiff's burden to impose

16 the duty to defend merely requires a showing that there is a potential for coverage under the

17 policy. As the California Court of Appeal explained:

18                 The defense duty is not contingent upon indemnity liability, but is
                   determined at the outset of the underlying action by comparing
19                 the policy provisions with the complaint allegations and any
                   relevant extrinsic evidence to determine *if there is any potential of*
20                 *coverage under the policy.* If there is, a defense is owed even
                   where ultimately it is determined there was no coverage and
21                 therefore no indemnity liability.

22 *Maryland Casualty Co. v. Nat'l Am. Ins. Co.*, 48 Cal. App. 4th 1822, 1828 (1996) (emphasis

23 added); *see also Foster-Gardner, Inc. v. Nat'l Union Fire Ins. Co.*, 18 Cal. 4th 857, 869 (1998).

24         The issue here is whether Landmark had and continues to have a duty to defend

25 Mountain Cascade for claims against it relating to the explosion. The Landmark policy

26 indicated that Mountain Cascade, as an additional insured, was covered "with respect to liability

27

28         [3]Plaintiff argues that this motion should be granted due to defendant's tardiness in filing its opposition
   to this motion. While such neglect is frowned upon, this order chooses to address the motion on its merits.

                                          5

**United States District Court**
For the Northern District of California

1    arising out of 'your work' for that insured by or for you" (Ruettgers Decl. Exh. C).  On several

2    occasions, the California courts have addressed the rights of an additional insured under

3    insurance contracts containing identical "arising out of" language.  The California courts have

4    consistently interpreted insurance contracts containing this language broadly.

5           In *Acceptance Insurance Company v. Syufy Enterprises*, 69 Cal. App. 4th 321 (1999),

6    the California Court of Appeal provided such a broad reading of "arising out of."  In *Syufy*, a

7    theater owned by Syufy had contracted with a construction company to improve the lighting

8    and temperature controls at the theater.  The construction company included Syufy as an

9    additional insured under its general-liability policy "with respect to liability arising out of 'your

10   work' for that insured by or for you."  *Id*. at 324.  One of the construction workers, while on a

11   break, fell through a roof hatch and severed his finger.  An investigation suggested that Syufy

12   had known the hatch was faulty for years.  The construction company's insurer sued to recover

13   from Syufy and its insurer on the grounds that it was Syufy's negligence that caused the

14   worker's injury and that the injury was sustained during a time during a non-work time.  The

15   trial court granted Syufy's insurer summary judgment on ground that the construction

16   company's policy provided coverage to Syufy even for Syufy's independent negligence.  The

17   California Court of Appeal affirmed.

18          According to *Syufy*, the "arising out of" clause was not an ambiguous provision.  Rather,

19   the decision explained:

20                California courts have consistently given a broad interpretation to the terms
                 "arising out of" or "arising from" in various kinds of insurance provisions.  It is
21               settled that this language does not import any particular standard of causation or
                 theory of liability into an insurance policy.  Rather, *it broadly links a factual*
22               *situation with the event creating liability, and connotes only a minimal causal*
                 *connection or incidental relationship*.
23
     *Id*. at 328 (emphasis added).  Applying this standard, the decision concluded that the worker's
24
     "injury clearly 'arose out of' the work he was performing on the roof of Syufy's building."
25
     "The relationship between the defective hatch and the job was more than incidental, in that [the
26
     worker] could not have done the job without passing through the hatch."  The construction
27
     company's insurer, therefore, had to cover Syufy for purposes of the worker's accident.
28

United States District Court

For the Northern District of California

1    In *Fireman's Fund Insurance Companies v. Atlantic Richfield Company*, 94 Cal. App.

2 4th 842 (2001), the California Court of Appeal followed the *Syufy* rule.  In *Fireman's Fund*, an

3 employee for a construction company performing work at Atlantic Richfield's plant was injured

4 when a wooden step collapsed.  Atlantic Richfield apparently negligently maintained the

5 wooden step.  Atlantic Richfield, however, was an additional insured under the contractor's

6 policy for injuries arising out of the contractor's work for Atlantic Richfield.

7    The *Fireman's Fund* opinion reiterated the broad scope to be given to the phrase

8 "arising out of" in insurance contracts.  Accordingly, "the connection between [the construction

9 company's] work and [Atlantic Richfield's] obligation to pay for [the worker's] injuries is

10 sufficient to establish the minimal causal connection."  *Id*. at 849.  The *Fireman's Fund* opinion

11 rejected an argument on grounds of public policy, finding that "there is no demonstrable public

12 policy favoring a narrow interpretation of additional insured clauses."  *Id*. at 853.  "Rather, the

13 majority view implies a public policy which favors freedom of contract and allows parties, if

14 they so chose, to obtain coverage for the additional insured that goes beyond vicarious liability

15 arising out of the negligence of the named insured."

16    The California Court of Appeal followed *Syufy* yet again in *Vitton*, *supra*, 110 Cal. App.

17 4th at 766–67.  Applying *Syufy*'s broad interpretation of "arising out of," the *Vitton* opinion

18 concluded that a contractor was covered under a subcontractor's general-liability policy.  In

19 *Vitton*, the contractor sued a subcontractor to indemnify the contractor for an underlying lawsuit

20 brought by a roofing worker.  The roofer feel through the floorboards after hours.  The

21 subcontractor apparently cut the hole in the roof decking and left the hole uncovered.  The

22 contractor, however,  was the party responsible for assuring the safety of the premises.  The

23 contractor also had done further work on the roof after the subcontractor left and failed to cover

24 the hole.

25    The subcontractor had added the contractor as an additional insured for damages

26 "arising out of" the subcontractor's work. The *Vitton* opinion explained that this imposed a

27 duty to defend for even minimally related accidents.  "[T]he fact that an accident is not

28 attributable to the named insured's negligence is irrelevant  when the additional insured

United States District Court

For the Northern District of California

1    endorsement does not purport to allocate or restrict coverage according to fault." *Id*. at 767–68.

2    "Under these circumstances, we conclude there is a sufficient 'minimal causal connection'

3    between the named insured's work and the situation giving rise to liability to trigger coverage

4    for Vitton as an additional insured."

5           In its opposition, Landmark relies on *St. Paul Fire and Marine Insurance Company v.*

6    *American Dynasty Surplus Lines Insurance Company*, 101 Cal. App. 4th 1038 (2002).  In *St.*

7    *Paul*, a subcontractor's employee was feeding electrical lines through a conduit.  Meanwhile,

8    independently of that work, employees of the general contractor were pressure testing a pipe.

9    During the pressure testing, a portion of the pipe exploded and injured the leg of the

10   subcontractor's employee.  The *St. Paul* opinion concluded that even under a policy naming the

11   contractor as an additional insured for damages "arising out of" the subcontractor's work, the

12   contractor was not covered.  The *St. Paul* opinion, unlike the three decisions in the *Syufy* line,

13   applied a higher standard of causality to the "arising out of."  This, however, was due to a

14   notable difference in the contractual language of the subcontracting agreement at issue in

15   *St. Paul*.  The indemnification provision in the agreement at issue in *St. Paul* limited the

16   subcontractor's indemnification duties to "liability for damages attributable to bodily injury

17   (including for attorney's fees) that arose from, in whole or in part, '*any act or omission*' of the

18   subcontractor."  *Id*. at 1042 (emphasis added).  According to the *St. Paul* decision, the inclusion

19   of the "act or omission" clause

20              [C]an have no other meaning or purpose than to limit the scope of
                [the subcontractor's] indemnity to injuries occurring in
21              circumstances over which it has at least some control and where it
                is engaged in activity that is causally related in some manner to
22              the injury for which indemnity is claimed.

23   *Id*. at 1052–53.  Moreover, the opinion concluded that the circumstances of the worker's leg

24   injury did not give rise to a causal relationship under even the most lenient standard because the

25   injuries were entirely incidental to the subcontractor's work.

26          There is an "act or omission" clause in the indemnification agreement between

27   Mountain Cascade and Matamoros as well, as quoted above (Williamson Decl. Exh. A).  But

28   that clause does not limit the scope of "arising out of" in the way those words limited the

8

United States District Court
For the Northern District of California

1    "arising out of" clause in *St. Paul*. Rather, Mountain Cascade and Matamoros' agreement still

2    indicated that the indemnification was to extend to any liabilities related in any way related to

3    the agreement or to projects pursuant to the agreement. Significantly, those two subclauses

4    were not limited by the "actions or omissions" clause. Moreover, even the subclause that did

5    contain the limitation to "actions or omissions," indicated that the actions or omissions of

6    Matamoros merely had only to be "alleged," not actual. Finally, the Landmark policy itself

7    contained no such limitation, but rather used the exact same "arising out of" language found to

8    have a broad scope in the *Syufy* line of cases (Ruettgers Decl. Exh. C).

9         There is thus no reason to depart from the *Syufy* rule here. There is at least a *potential*

10   that the damages, injuries and deaths occurring as a result of the Walnut Creek explosion bear a

11   minimal causal connection to Matamoros' welding work. That is all National Union needs to

12   show for purposes of this motion regarding Landmark's duty to defend. *Maryland Casualty*,

13   48 Cal. App. 4th at 1828. Both the Fire Marshal and CalOSHA concluded that Matamoros'

14   welding equipment ignited the leaking fuel. Beyond those reports, it is undisputed that

15   Matamoros' workers were present as a necessity of performing their subcontracting duties, just

16   as in *Syufy* itself. Even if defendant Landmark ultimately proves at trial that injuries had

17   absolutely nothing to do with Matamoros' work under the subcontracting agreement, as in

18   *St. Paul*, National Union has met its burden to show as a matter of law that Landmark has a duty

19   to defend given the potential that the damages did arise out of Matamoros' work.

20        **2.    PRIMARY INSURER.**

21        Landmark argues that even if Mountain Cascade is covered under the policy,

22   Landmark's obligation to defend is not primary because Matamoros was not negligent.

23   "Primary coverage is insurance coverage whereby, under the terms of the policy, liability

24   attaches immediately upon the happening of the occurrence that gives rise to liability."

25   *Hartford Cas. Ins. Co. v. Mt. Hawley Ins. Co.*, 123 Cal. App. 4th 278, 284 n. 2 (2004) (internal

26   citation omitted).

27        This order finds that a determination of which insurer is primary is premature at this

28   juncture. Resolution of the ultimate issues of negligence and culpability will be necessary for a

proper determination of this question.  This order leaves to the parties the determination as to how to apportion the costs of defending Mountain Cascade in the underlying actions in the interim.

### CONCLUSION

For the foregoing reasons, plaintiff's motion for partial summary judgment on the issue of defendant's duty to defend is **GRANTED**.  This order does not, however, reach the issue of which insurer is the primary insurer.

**IT IS SO ORDERED.**

Dated:  May 22, 2006

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE